# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN B. HENDRICKSON,<br><br>            Plaintiff,<br>    vs.<br><br>UNITED STATES OF AMERICA,<br><br>            Defendant. | CASE NO. 11cv1746-LAB (NLS)<br><br>**VERDICT AND ORDER OF JUDGMENT** |

Following a bench trial in this case, the Court announced its findings and verdict, and also announced its intent to issue a written order following the submission of additional briefing. This order memorializes and supplements the Court's oral pronouncement of verdict. To the extent there is any conflict between the Court's oral pronouncement of verdict and this order, the Court intends for this written order to control.

**Factual Background**

On Thursday, August 27, 2009, Border Patrol agent Ryan Moore, in the course of his duties, was driving a Chevy Silverado westbound on Otay Mountain Truck Trail (OMTT), an unpaved mountain road with multiple blind turns and unprotected dropoffs. Hendrickson was riding a motorcycle, heading eastward on the same road. Both drivers had driven this road many times before and were familiar with it. Hendrickson's friend, Matthew Zamora, was riding a motorcycle approximately 30 feet behind Hendrickson.

/ / /

Approximately 200 yards east of an area known as Doghouse Junction is an approximately 90-degree blind curve. A pole-mounted convex mirror is located on the south side of the curve to help motorists see oncoming traffic. Traveling westward, as Moore was, the roadway before the corner is very wide, with a turnout on each side. After the corner, it narrows to just over eleven feet.

8.     At approximately 3:45 to 3:50 p.m., Moore rounded the curve as Hendrickson was approaching it. The two vehicles collided, throwing Hendrickson from his motorcycle and injuring him. He suffered multiple fractures of the left leg. Later, because his injuries did not properly heal, his leg was amputated below the knee.

Hendrickson brought claims under the Federal Tort Claims Act (FTCA) for injuries sustained in a vehicular accident.  Under the FTCA, the U.S. is liable only to the same extent that a private person would be. *See Filice v. United States* 271 F.2d 782, 783 (9th Cir. 1959). This means that the U.S. is liable only to the same extent that a driver in California would be, under like circumstances. The same standard of care applies to both parties here. The briefing and evidence in this case focused on speed, road position, failure to use the convex mirror, failure to use radio "call outs," and failure to yield right-of way as factors contributing to the accident. Some of the Court's rulings on applicable law are set forth in its order of February 3, 2014, which also required supplemental briefing on issues of state law. This order supplements those rulings.

**Liability**

**Speed**

The Basic Speed Law requires that drivers travel no more than is safe under the circumstances. Cal. Veh. Code § 22350. The expert witnesses agreed that 15 m.p.h. was a safe speed for this stretch of highway, and that if both vehicles were traveling at that speed, they could have stopped without colliding. The eyewitnesses testified that both drivers were going roughly 15 mph, but Zamora thought the Border Patrol vehicle was going a little faster.

/ / /

1    Expert witness Duran testified it was advisable to "creep" around blind corners at a
2 walking pace, or to stop and look around corners before turning, and that border patrol
3 agents such as Moore were taught to do that. But Moore testified he wasn't taught this - he
4 was only taught to go around corners slowly and to be careful. Martinez agreed he didn't
5 remember agents being taught to creep around corners or stop and get out. The Court
6 concludes the ordinary standard of care required only a reasonable speed and due care at
7 the highway on that day, not slowing to a walking pace or stopping the truck.

8    Expert witness Vanderpol thought Moore was going about 30 mph, based on the
9 length of the tire friction mark and the possibility that Moore saw Hendrickson in the convex
10 mirror, or braked for some other reason before rounding the corner and seeing Hendrickson.

11    But expert witness Beck said the mark was not the actual length of the friction
12 mark—it was longer than that. The only evidence of the friction mark's length was photos,
13 which didn't show the whole length of the friction mark. Beck testified there is nothing about
14 the quality of the friction mark that shows whether Moore was braking lightly, moderately, or
15 hard. If Moore was braking lightly, then slammed on his brakes, there's no way to tell from
16 the friction mark where that happened.

17    Both Moore and Hendrickson said they looked in the mirror and saw no oncoming
18 vehicle. Beck testified that the image of Hendrickson's motorcycle would have been an inch
19 or less— too small to see.  Moore also testified he slammed on his brakes only after
20 rounding the corner and seeing Hendrickson. Zamora testified that Moore wasn't skidding
21 around the corner, which corroborates this.

22    Beck used the Searle equation to calculate impact speed, and from there to infer
23 Hendrickson's driving speed. But Vanderpol testified this is not the appropriate way to
24 calculate impact speed of this type of collision. The Court finds this calculation is
25 questionable, and doesn't rely on it.

26    Based on the evidence, the Court concludes Hendrickson was traveling at a safe
27 speed of about 15 mph, and Moore was traveling somewhat faster than a safe speed. It's
28 impossible to say just how much faster; it wasn't so fast as to cause him to lose control of

his vehicle but it was fast enough that he couldn't avoid colliding with Hendrickson. The Court concludes this was a major cause of the accident.

**Road Position**

Normally, vehicles must drive on the right half of the roadway. Under Cal. Vehicle Code § 21650(e), they need not do this when the roadway isn't wide enough to allow them to. Here, the road wasn't wide enough for the Border Patrol vehicle to drive on its right half, but the motorcycle could have been driven on its right half. Under Cal. Vehicle Code § 21662, drivers on mountain roads with no marked center lines must "drive as near to the right-hand edge of the roadway as is reasonably possible."

While the road has an approximate center line, most vehicles straddle the center, creating a tire track on each side of the road. The physical evidence and testimony are in agreement that Hendrickson was driving left of the center line, in the left tire track, and did not manage to move right of the center line before the collision occurred. As Moore rounded the corner, he was in the middle of the road, but moved right when he saw Hendrickson approaching.

Expert Ezra testified it's acceptable or even advisable for a motorcyclist to drive left of center, in preparation to turn left, or when conditions are better on the left. Expert witness Rea disagreed, saying riders approaching a blind corner (as Hendrickson was) should stay near the right edge of the roadway, so as to see and be seen as early as possible by oncoming drivers. He also testified they should use the "delayed apex" turning technique, which requires that they stay right until they can see around the corner, and then execute a sharply arcing turn. Rea testified that larger vehicles such as cars and trucks can improve safety by using the delayed apex technique, but that it's not usual for them to do so.

While state law permits drivers to drive past the center line when the roadway is too narrow to allow them to stay entirely on the right half, it doesn't permit them to drive on the left half when, as here, the roadway is not too narrow. Under state law, Hendrickson should have stayed on the right half of the road. The Court also credits Rea's testimony that it is

///

safer for motorcyclists to use the delayed apex turning method, and that Hendrickson should have been on the right side of the road to do this.

Because Hendrickson was on the left half of the roadway, he saw Moore later, and was seen by Moore later, than if he had been on the right half.

The Court concludes Hendrickson's road position contributed to the accident, by delaying both drivers' response. But assuming both vehicles were approaching each other fast at the time they met, it appears the roadway was so narrow and Moore's truck was so wide that Hendrickson could not have avoided the collision altogether by passing Moore's truck, even if he were on the right half of the roadway. The Court determines that road position was a minor factor in the accident, and that Hendrickson contributed to the accident in this way.

### Convex Mirror

The Court credits the testimony that images in the mirror were too small to allow either driver to see the other before rounding the corner. The Court credits the drivers' testimony that they looked in the mirror and didn't see any oncoming vehicle. Failure to use the convex mirror did not cause or contribute to the accident.

### Audible Signal (Honking Horn)

Although failure to sound the horn was mentioned in briefing, it was only discussed in passing at trial. Under Cal. Vehicle Code § 21662, on mountain roads that are too narrow to allow a driver to remain entirely right of center, a driver must give an audible warning, that is, honk his horn, when approaching a curve with an obstructed view. And Cal. Veh. Code § 27000 requires motor vehicles, including motorcycles, to have a horn that can be heard from at least 200 feet away. It was undisputed that neither Moore nor Hendrickson sounded his horn.

This requirement applies to Moore, and his failure to honk his horn may have contributed to the collision. Because Hendrickson could drive entirely right of center if he wanted to, this requirement does not at first blush seem to apply to him. But the statute deals with the problem of vehicles extending over into the other half of narrow mountain roadways,

and it is clear Hendrickson was driving left of center. Even assuming this statute didn't require him to give an audible signal, an ordinarily prudent person would know of the requirement and its rationale, and would sound his horn.

Hendrickson was still some distance from the curve, but obviously still close enough that a vehicle could have been approaching from the other side, where he couldn't see it. Because of this difference, Hendrickson could have reasonably sounded his horn later than Moore and still complied with this requirement. There was, however, no evidence that the two drivers could have heard a horn around the corner. This may not have contributed to the accident at all, but if it did, it likely contributed only slightly. And if it did play any role, the parties were equally at fault.

**Radio Call Outs**

Evidence showed it was usual for agents to use radio "call outs" to announce their position to other Border Patrol vehicles and possibly learn of vehicles using mountain roads. While Moore had a radio and could have done this, Hendrickson didn't have one. He therefore couldn't have heard the call out nor alerted Moore to his presence on the road. Also, there was no evidence other agents could or would have alerted Moore to Hendrickson's presence on the road.  There's no evidence Moore's failure to use radio call outs, even assuming it was negligent, played any role in the accident.

**Right of Way**

Under Cal. Vehicle Code § 21661, when the roadway is so narrow that vehicles traveling in opposite directions cannot pass, the driver descending the grade is required to yield the right of way and, if necessary, back up to allow the other driver to pass.

Had the truck and motorcycle completely stopped, it is likely they could have passed slowly and with care, so there was no need for Moore to back up. But this provision reflects a legislative judgment that, on narrow roads, downhill drivers ought to be prepared to yield the right of way to uphill drivers. Here, the overall grade of the road was such that Moore was the downhill driver. The construction of this road, with two turnouts before the corner as Moore approached it, supports the conclusion that Moore was traveling downhill.

Even if Moore were traveling at what an ordinarily prudent driver would consider a safe speed, he was also required to take into account the possibility that he might have to yield the right of way to an oncoming vehicle past the corner. Here, that might have required him to go slower or take other precautions. His failure to be prepared to yield the right of way contributed to the collision.

### Apportionment of Fault

Under California law, fault can be apportioned between the parties, and the Court finds that is required here. The Court finds Moore (and through him, the United States) bore 85% of the responsibility for the collision, and Hendrickson bore 15%.

### Damages

The Court requested both parties to submit supplemental information regarding future medical costs, but the government opted not to do so. Hendrickson's damages included past and future lost wages; past medical expenses; future medical expenses and general care (such as housekeeping assistance); and emotional distress, pain and suffering.

### Earnings

The Court finds Hendrickson lost $179,405 in past earnings capacity. Offset by some past earnings and disability payments, his past earnings losses were $107,232. The Court finds he would be able to return to his customary work in the sound recording industry, provided he has an assistant and vocational rehabilitation. His lost future earnings, offset by the cost of hiring an assistant and vocational rehabilitation are $362,499. Total past and future lost wages are $469,731.

### Medical Expenses and In-home Assistance

Hendrickson suffered fractures, pain, amputation, headaches, stump pain and phantom pain, difficulty using his prosthesis and ambulating, and lack of concentration (possibly caused by the pain or headaches, or the medication used to control them), and required extended therapy. He will also require some in-home medical assistance and housekeeping assistance in the future, occasioned by his injuries.

///

| | |
|---|---|
| 1 | Hendrickson's past medical expenses are $589,480.  As announced from the bench, |
| 2 | the Court finds that Plaintiff has adequately established his future medical expenses, with |
| 3 | the exception of an occipetal stimulator and the cost of a certified nursing assistant (CNA) |
| 4 | to provide in-home nursing assistance. The Court finds that while the occipetal stimulator |
| 5 | might help Hendrickson's overall health, he failed to show that his need for it was caused by |
| 6 | this accident or that it is necessary for treating injuries he sustained in this accident. The |
| 7 | Court finds Hendrickson will require the help of a CNA, but only from the age of 65 onward. |
| 8 | Reducing the cost of future medical care and in-home care to account for these two factors, |
| 9 | the Court finds Hendrickson's future medical care and home care costs are $1,846,780. His |
| 10 | total medical costs, past and future, are $2,436,260. |
| 11 | **Pain and Suffering** |
| 12 | The Court finds the physical and emotional pain and suffering Hendrickson suffered |
| 13 | and will suffer is not constant over time. His pain and emotional strain were at their worst |
| 14 | initially, but the physical pain declined over time and the stress caused by his injuries will |
| 15 | decline as he becomes accustomed to his handicap. In addition, with increasing age some |
| 16 | loss of independence was reasonably predictable even if the accident had never happened. |
| 17 | The Court agrees with the requested award of $250,000, but only for the first five years. After |
| 18 | that, the Court concludes Mr. Hendrickson is entitled to $75,000 for each year of his |
| 19 | expected life span from 2014 onward (29.1 years). The total amount of damages attributable |
| 20 | to pain and suffering is $3,432,500. |
| 21 | **Total Damages Awardable** |
| 22 | The Court finds the total amount of Hendrickson's damages to be $6,338,491. |
| 23 | Multiplying the degree of the United States' liability (85%) by the total damages, the Court |
| 24 | finds the U.S. is liable to Mr. Hendrickson in the amount of $5,387,717.35. |
| 25 | / / / |
| 26 | / / / |
| 27 | / / / |
| 28 | / / / |

**Conclusion and Order**

As discussed above, the Court finds for Hendrickson, and **AWARDS** him $5,387,717.35 in damages. The Clerk is directed to enter judgment in favor of the Plaintiff in this amount, and against the Defendant.

At the conclusion of trial, the Court retained the exhibits to allow it to prepare this order. The parties are now directed to pick up their respective exhibits from chambers, and to retain them pending any appeal.

**IT IS SO ORDERED**.

DATED: June 18, 2014

*(signature)*

**HONORABLE LARRY ALAN BURNS**
United States District Judge